UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| EMMITT DEWAYNE ATKINS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-331 |
| | § | |
| JOSEPH BRADFORD, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION
ON PENDING MOTIONS**

In this prisoner civil rights action, plaintiff Emmit Dewayne Atkins alleges that certain McConnell Unit officers and medical personnel violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from an assault by another offender, and, following the assault, by failing to provide him with adequate medical attention. Following § 1915A screening, plaintiff's failure to protect claims were retained against Officer Joseph Bradford and Officer Gabriel Granados (the "security defendants"), in their individual capacities, and his claims of deliberate indifference to his serious medical needs were retained against (1) Dr. Theresa Whitt, (2) Nurse Practitioner ("N.P.") Lori Hudson, and (3) Erica Perales, a Licensed Vocation Nurse (the "medical defendants"), in their individual capacities. (*See* D.E. 8, 10).

The following motions are pending:

(1)     Officer Granados' motion for summary judgment (D.E. 65) and supplement thereto (D.E. 69);

(2)    The medical defendants' motion to dismiss for failure to exhaust administrative remedies (D.E. 81);

(3)    The medical defendants' motion for summary judgment to dismiss plaintiff's claims for failure to allege a cognizable constitutional violation (D.E. 83); and

(4)    Plaintiff's cross-motion for summary judgment.  (D.E 88).

For the reasons stated herein, it is respectfully recommended that the medical defendants' motion to dismiss for failure to exhaust be denied.  It is further respectfully recommended that summary judgment be granted in favor of Officer Granados, and that plaintiff's claims against this defendant be dismissed with prejudice.  Finally, it is respectfully recommended that the medical defendants be granted summary judgment in their favor, and that plaintiff's claims against them be dismissed with prejudice, and that plaintiff's motion for summary judgment be denied.

## I.    Jurisdiction.

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## II.    Procedural background.

Plaintiff Emmitt Dewayne Atkins is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and he is currently incarcerated at the Eastham Unit in Lovelady, Texas, although his complaint involves events that arose while he was confined at the McConnell Unit in Beeville, Texas.

Plaintiff filed his original complaint on October 24, 2012 complaining that, on May 13, 2012, he was seriously injured when another inmate threw scalding water on him. (D.E. 1). Plaintiff related that, at the time of the assault, and in violation of prison policy, Offender Glen Bethany brought a "hot pot"[1] into the dayroom and used it to heat water, which he then threw on plaintiff, causing him first and second degree burns over 11% of his body. *Id.* Plaintiff alleged further that, following the assault, he was denied adequate medical treatment, until he was transferred two days later to the University of Texas Medical Branch Hospital, Galveston, Texas ("Hospital Galveston"). *Id.*

On November 5, 2012, a *Spears*[2] hearing was conducted, following which certain claims and defendants were dismissed, but the Court retained plaintiff's Eighth Amendment claims against Officer Bradford and Officer John Doe, later identified as Officer Gabriel Granados, who were allegedly in charge of the dayroom on the day of the assault, as well as the three McConnell Unit medical defendants who evaluated and treated plaintiff immediately after the assault, as well as the following day.

On December 14, 2012, the medical defendants filed their Answer and raised the defense of qualified immunity. (D.E. 13). In addition, the Attorney General, as Amicus Curiae, related that Officer Bradford was no longer employed by the TDCJ, and submitted under seal his last known address.[3] (D.E. 14).

---

[1] Plaintiff is referring to a small, electrical appliance that is used to heat liquids or food, and is also known as a "hot plate."

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985); *see also Eason v. Holt*, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a *Spears* hearing is incorporated into the pleadings).

[3] Service was attempted but returned unexecuted as to Officer Bradford (D.E. 28), and at a July 22, 2013 telephone conference, plaintiff moved orally to dismiss without prejudice his claims against Officer Bradford.

On March 5, 2013, Officer Granados filed his Answer and raised the affirmative defense of qualified immunity.  (D.E. 48).

On July 3, 2013, Officer Granados filed his motion for summary judgment.  (D.E. 65), and on July 17, 2013, he filed his supplemental exhibit.  (D.E. 69).

On August 19, 2013, the medical defendants filed a motion to dismiss for failure to exhaust administrative remedies.  (D.E. 81).

On September 6, 2013, plaintiff filed his response in opposition to the medical defendants' motion to dismiss (D.E. 86), and on October 9, 2013, he filed his cross-motion for summary judgment against all defendants.  (D.E. 88).  On October 29, 2013, the medical defendants filed a response in opposition to plaintiff's summary judgment motion.  (D.E. 89).

## III.   Evidence offered.

In support of his motion for summary judgment, Officer Granados offers the following evidence:

Ex. A:   Plaintiff's grievance records from January 2012 through December 2012 (D.E. 65-1, pp. 1-59);

Ex. B:   TDCJ Emergency Action Committee Report investigating the May 13, 2012 assault (D.E. 65-2, pp. 1-35);

Ex. C:   Offender Protection Investigation ("OPI") records for plaintiff (D.E. 65-3, pp. 1-12);

Ex. D:   Affidavit of Gabriel Granados (D.E. 69, pp. 2-6); and

Ex. E:   TDCJ Offender Handbook Policy regarding hot pots (D.E. 65-5, pp. 1-8).

In support of their motion to dismiss (D.E. 81), the medical defendants offer a copy of the TDCJ's grievance policy, (Ex. A), the TDCJ Offender Handbook relating the grievance policy (Ex. B), a TDCJ Grievance Program Pamphlet (Ex. C), and a copy of plaintiff's grievance records from May 2012 through December 2012.   (Ex. D).   In support of their motion for summary judgment (D.E. 83), the medical defendants offer:

Ex. A:    Plaintiff's TDCJ medical records from December 1, 2011 through January 4, 2013 (D.E. 84, pp. 1-32);

Ex. B:    Plaintiff's medical records from Hospital Galveston (D.E. 84-1, pp. 1-15);

Ex. C:    Plaintiff's Unit Classification Committee History Form dated July 5, 2012 (D.E. 84-2, pp. 1-3); and

Ex. D:    Affidavit of Dr. Steven Paul Bowers, Legal Coordinator for the University of Texas Medical Branch, Correctional Managed Care ("UTMB/CMC") (D.E. 84-3, pp. 1-6).

In support of his motion for summary judgment (D.E. 88), plaintiff offers his own declaration made under penalty of perjury.  (Ex. 1).

The summary judgment evidence establishes the following:

**1.   *The assault.***

On May 13, 2012, plaintiff was housed at the McConnell Unit on 4-Building, D-Pod, in general population.  (*See* D.E. 65, pp. 59-60, plaintiff's Step 1 grievance setting forth details of the assault).  Between 9:30 and 10:00 p.m. that evening, an offender who lived in the cell next to plaintiff, Glen Bethany, "rigged up" a hot pot in the dayroom, on which he was boiling water.  *Id.* at 59.  Plaintiff was in the dayroom watching television.

*Id.* Plaintiff and Offender Bethany began arguing about the television.[4]  (*See* D.E. 65-2, p. 24, Report of Emergency Action Committee).  Thereafter, Offender Bethany grabbed the hot pot and threw the boiling water on plaintiff, burning the right side of his face, ear and eye, the right side of his shoulder and chest, and the right side of his back. (*See* D.E. 84, pp. 27-32, initial medical report).

At the time of the assault, Officer Bradford was working the dayroom floor as the "rover," and Officer Gabriel Granados was working the picket; both officers were responsible for security in D-pod that evening.[5]  (*See* D.E. 65-2, p. 16, Administrative Incident Review).  Officer Bradford had just exited 2-section of D-pod and was headed toward the 3-section dayroom when he witnessed Offender Bethany assault plaintiff.[6]  *Id.* Plaintiff ran out of the dayroom and directly to Officer Bradford, telling him that he needed immediate medical attention because he had been burned with hot water.   *Id.*

---

[4] Offender Bethany told investigators that plaintiff threatened him with a "shank" or knife, and this is what prompted him to assault plaintiff with the boiling water.  (*See* D.E. 65-2, p. 24, Report of Emergency Action Committee).

[5] In his affidavit, Officer Granados describes the responsibilities of the rover and the picket officer, and the layout of 4-Building, D-pod.  (See D.E. 69 at 3, Granados Aff't at ¶ 4).  There are three sections in each pod, and three rows of cells within each section.  *Id.*  Each row has eight, 2-man cells, such that there are generally 48 inmates in each section, and 144 inmates per pod.  *Id.*  Each section has its own dayroom.  *Id.*  At least every hour, the rover conducts an ingress/egress procedure also known as "in and out," which allows the inmates to enter or exit there cell during "dayroom time."  *Id.*  Dayroom time allows inmates to stay in the open space within their living quarters and "relax, watch TV or play board games for the remainder of the day until 10:30 p.m.," after which they are secured in their cells.  *Id.*

The picket is elevated about 10 feet above the ground and encased in thick glass, preventing the picket officer from hearing any verbal communications on the floor level.  *Id.*  During ingress/egress, it is the responsibility of the picket officer to maintain visual contact on the rover and to open any particular door as signaled to by the rover.  *Id.*  Inside the picket, there is a control panel that is positioned facing the section which it controls.  *Id.*  After the door has been electronically opened from the picket, the rover ensures it is relocked.  *Id.*

[6] Officer Granados told investigators that he did not witness the incident between plaintiff and Offender Bethany as he was monitoring the ingress/egress of Officer Bradford.  (*See* D.E. 65-2, p. 16, and D.E. 69, Granados Aff't at ¶ 4).

Officer Bradford signaled to Officer Granados in the picket to shut the door to prevent Offender Bethany from exiting the section. *Id.* He then placed plaintiff in the passive recreation yard, and called for a supervisor. *Id.* Lieutenant James and Sergeant Ybarra responded. *Id.* Because Offender Bethany claimed that plaintiff had threatened him with a shank, plaintiff's cell was immediately searched for a weapon. *Id.* (*See also* D.E. 65-2, p. 14, Offender Bethany's statement to prison officials following the incident). While waiting in the recreation yard, plaintiff repeatedly stated that he needed immediate medical attention, but officials responded he would "get it in a minute." (*See* D.E. 65-1, p. 3, plaintiff's Step 1 grievance). Eventually, an officer arrived and escorted plaintiff to medical. *Id.*

### 2. *Medical treatment.*

Plaintiff's urgent/emergency medical care records for May 13, 2012 indicate that he arrived at the infirmary at 10:15 p.m. (D.E. 84, pp. 27-32). Plaintiff went to the infirmary, and his condition was stable upon arrival. *Id.* at 27. Plaintiff related to Nurse Perales that he had been assaulted by another offender who had thrown boiling water on him. *Id.* Nurse Perales recorded his quantitative pain level as a 9.5 on a scale of zero to ten, with zero being no pain and ten the highest, and noted that plaintiff's pain was constant and burning. *Id.* Upon examination, Nurse Perales noted that plaintiff's apical pulse was regular, and his peripheral pulses were present. *Id.* at 28. His respiration was normal, his lungs were clear, and he had no blood loss or edema. *Id.* Plaintiff's pupils were equal and reactive and he was oriented and alert. *Id.* Nurse Perales noted first degree burns to plaintiff's right side of face, right side of chest extending down the

xiphoid process, right shoulder, upper-mid back, and left forearm. *Id.* at 29. Plaintiff complained that he could not see using his right eye, and he described it to Nurse Perales as "hazy like there's a film over it." *Id.* Nurse Perales performed a visual acuity test and recorded plaintiff's near vision as 20/20, and his distance vision as 20/200, in both eyes. *Id.* Plaintiff related that he used free-world prescription reading glasses. *Id.*

Plaintiff denied shortness of breath, and Nurse Perales did not observe any nasal singeing or swelling. (D.E. 84, p. 29). However, plaintiff's right eye was watering and "white drainage" was noted. *Id.* Nurse Perales contacted and consulted Dr. Whitt who ordered: (1) Cortisporin Ophthalmic ointment applied to plaintiff's right eye; (2) an eye-patch for plaintiff's right eye; and (3) non-aspirin for pain. *Id.* Plaintiff was instructed to return to the clinic the following day for a follow-up appointment with the provider. *Id.* Plaintiff was returned to his cell in stable condition. *Id.* at 30.

The next afternoon, on May 14, 2013 at 1:07 p.m., plaintiff returned to the infirmary where he was seen NP Hudson for his burns. (D.E. 84, pp. 20-23). NP Hudson noted that plaintiff had "first and second degree burns to right forehead, cheek, eyelid, nose, right shoulder, right side of back, right to midchest. Eye is very swollen but exam when eyelid pryed open shows erythema but intact pupil. Burn degrees are 4.5 % to face, 18% to chest, 9% to back – for total burn of 31.5%." *Id.* NP Hudson made an "urgent ophthalmology appointment" for the following day at Hospital Galveston. *Id.* NP Hudson applied Silvadene, a topical sulfonamide/silver antibacterial cream, to the majority of plaintiff's burns, followed by a nonadherent dressing, and applied a triple antibiotic ointment for the burns on his eye, nose and right cheek. *Id.* Plaintiff was

instructed on how to clean his burns and provided with sterile saline, gauze and paper tape. *Id.*  NP Hudson continued the Cortisporin Ophthalmic for plaintiff's right eye, as well as the eye patch, and also prescribed Bactrim. *Id.*  She gave plaintiff one Tylenol #3, and prescribed two Tylenol 325 mg tablets every four hours. *Id.*

On May 15, 2012, plaintiff was seen at 12:05 p.m. at the Ophthalmology Clinic at Hospital Galveston. (D.E. 84, p.19).  Plaintiff complained of severe pain from his burns, and the eye specialist immediately prescribed two Tylenol #3, and contacted the Burn Unit at Hospital Galveston. *Id.*  By 12:42 p.m., plaintiff related that the pain was more tolerable, having decreased from a level of 10 to a 7, and he was taken to the Burn Unit for evaluation. *Id.*

At the Hospital Galveston Burn Unit, plaintiff was admitted with a diagnosis of 2nd and 3rd degree burns to 11% of his body.  (D.E. 84-1, pp. 3-15).  While there, he underwent tub baths to clean his wounds, and he received IV antibiotics as well as morphine and norco for his pain. *Id.* at 5, 7.  On May 19, 2012, plaintiff was discharged from the Burn Unit and transferred to the TDCJ's Young Medical Facility in Dickinson, Texas, for continued burn care. *Id.* at 3.

On June 6, 2012, Dr. Patrice Barnum at the Young Medical Facility noted that plaintiff's wounds were healing well with no infection.  (D.E. 84, p. 12).  Dr. Barnum noted further that plaintiff was tolerating a regular diet and normal activity, and he had good urinary output. *Id.*  He was discharged that day with the following medications: Absorbase cream, Tylenol 325 mg, 2 tabs 3-times per day, and Omeprazole for acid reflux. *Id.* at 13.

Plaintiff arrived back at the McConnell Unit on June 15, 2012; however, plaintiff refused to be evaluated by NP Hudson at that time, alleging that she had failed to treat him properly following the assault.  (D.E. 84, p. 10).  He was rescheduled to see the provider.  *Id.*

On June 20, 2012, plaintiff was seen by NP Hudson for follow-up care concerning his vision and pain.  (D.E. 84, p. 7).  She ordered a visual acuity test, prescribed Ibuproden 600 mg, and an Ophthalmology referral.  *Id.*  The referral to Hospital Galveston was approved on June 25, 2012.  *Id.* at 5.

On October 1, 2012, plaintiff was seen at the Ophthalmology Clinic at Hospital Galveston.  (D.E. 84, p. 3-4).  The ophthalmologist diagnosed plaintiff with a history of injury to the right eye, but upon testing and evaluation found plaintiff was stable with "no evidence of injury to OD [right eye]," and no retinal tear.  *Id.* at 4.

### 3.  *Plaintiff's Grievances.*

On May 31, 2012, plaintiff filed a Step 1 grievance, Grievance No. 2012191469, complaining about the May 13, 2012 assault by Offender Bethany. (D.E. 65-1, p. 5-6; D.E. 81-4, p. 3-4).   Plaintiff claimed that Officer Bradford and other security personnel had been negligent in allowing the offender to bring a hot pot into the dayroom, and that Offender Bradford was deliberately indifferent to his serious medical needs because he delayed taking plaintiff to the infirmary.  *Id.*  Plaintiff complained further that, once he arrived at the infirmary, medical personnel were deliberately indifferent to his serious medical needs because they only prescribed him Tylenol when they should have sent him to the hospital.  *Id.*

On July 2, 2012, plaintiff was transferred to the Eastham Unit following an Offender Protection Investigation ("OPI").   (*See* D.E. 84-2, p. 3, Plaintiff's Unit Classification Commitment History form).

On August 17, 2012, Warden Barber denied plaintiff's Step 1 grievance as moot noting that plaintiff had been transferred off the McConnell Unit following the OPI. (D.E. 65-1, p. 6).

**IV.    The medical defendants' motion to dismiss.**

The medical defendants move to dismiss plaintiff's claims against them on the grounds that he failed to file the required Step 1 and Step 2 grievances regarding his medical treatment following the assault, or to otherwise notify prison authorities of his complaints against Dr. Whitt, NP Hudson, and Nurse Perales, such that his claims must be dismissed for failure to exhaust administrative remedies, as required by 42 U.S.C. § 1997e(a).   (*See* D.E. 81).   Plaintiff opposes the medical defendants' dismissal motion and details the administrative problems and complications he encountered in attempting to exhaust these claims.  (D.E. 86).

The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S. C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002). Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process. *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001). A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints. *Jones v. Bock*, 549 U.S. 199, 215 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam). The Fifth Circuit requires that both steps be completed in order to file suit in federal court. *Johnson v. Johnson*, 385 F.3d 503, 515-16 (5th Cir. 2004).[7]

There is no dispute that on May 31, 2012, plaintiff filed a Step 1 grievance, Grievance No. 2012191469, complaining about the May 13, 2012 assault and alleging that the security defendants failed to protect him, and that Officer Bradford and the

---

[7] Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the issue he is complaining about. *Wendell v. Asher*, 162 F.3d 887, 891 (5th Cir. 1998). The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has ten days to appeal by filing a Step 2 grievance. *Wendell*, 162 F.3d at 891. Once the two-step process has been completed, the offender's administrative remedies within the TDCJ have been exhausted. *See* http://www.tdcj.us/publications/admin-rvw/Offender%20Grievance%20pamphlet%202007.pdf.. Thereafter, an inmate dissatisfied with the disposition of his Step 2 grievance may file suit in district court. *See* 42 U.S.C. § 1997e(a).

medical defendants were deliberately indifferent to his serious medical needs.  (*See* D.E. 81-4, p. 3-4).   However, although the medical defendants state that Warden Barber simply denied this grievance on August 13, 2012 as moot, they omit the events that occurred prior to that decision.  Plaintiff testifies that the Step 1 grievance was returned to him unprocessed with the notation that the time period to file a grievance had expired. (D.E. 86, p. 1).  Indeed, included in Officer Granados' summary judgment evidence, there is a copy of plaintiff's step 1 grievance that was returned unprocessed to plaintiff on June 6, 2012, with the notation that "[g]rievable time period has expired."  (*See* D.E. 65-1, pp. 3-4).  Thereafter, on June 11, 2012, plaintiff filed a Step 2 appeal.  (*See* D.E. 1-1, pp. 1-2, copy of Step 2 grievance filed with plaintiff's original complaint).   However, there is no record of a Step 2 grievance in plaintiff's grievance records.  (*See* D.E. 81-4, p. 1-13).

After plaintiff filed his Step 2 appeal, on June 28, 2012, the Region IV Supervisor reviewed plaintiff's Step 1 grievance and found that it had been "inappropriately screened at step one."   (*See* D.E. 65-1, p. 11).  Plaintiff's Step 1 grievance was returned to the McConnell Unit staff with instructions to "process the grievance and waive the time limits, if necessary."  *Id.*  Plaintiff was not advised that the Region IV Supervisor had overturned the denial of his Step 1 grievance.  (D.E. 86, p. 2).

In summary, plaintiff has presented evidence that he submitted both Step 1 and Step 2 grievances.  The medical defendants fail to present an accurate account of how plaintiff's Step 1 grievance was processed, and fail to rebut plaintiff's assertion that he filed a Step 2 appeal.  The medical defendants' assertion that there is no Step 2 appeal in

plaintiff's grievance records should not be afforded any weight as the grievance records they offer do not include the Region IV Supervisor's actions or otherwise present a complete account of the facts.

The medical defendants also argue that plaintiff's Step 1 grievance did not provide sufficient detail for purposes of providing prison officials with sufficient notice of his claims. (D.E. 81, p. 6). Concerning the medical defendants, plaintiff grieved: "…Once to the infirmary I was examined by medical personnel only to be given eye drops and non-aspirin for pain instead of being hospitalized for my 1st, 2nd, 3rd degree burns as well as scratched cornea from the boiling hot water." (D.E. 81-4, p. 3). This allegation, combined with the fact that plaintiff was hospitalized for his injuries as of the date of the grievance,[8] was sufficient notice to the medical defendants regarding his complaints. *See Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004) (discussing how much detail is necessary in a prisoner's grievance and noting that the main purpose of exhaustion is to provide notice of the complaints to prison officials so that they might have an opportunity to address those complaints first).

The medical defendants fail to establish that plaintiff did not exhaust his administrative remedies. Therefore, it is respectfully recommended that the medical defendants' motion to dismiss (D.E. 81) be denied.

---

[8] The Fifth Circuit has recognized that the exhaustion requirement may be excused in rare and extraordinary circumstances such as when a prisoner is physically unable to do so. *See e.g. Days v. Johnson*, 322 F.3d 863 (5th Cir. 2003), overruled on other grounds by *Jones v. Bock*, 549 U.S. 199, 215 (2006).

V.      **Motions for Summary Judgment.**

A.      **Standard.**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## B.    Officer Granados' summary judgment motion.

Plaintiff claims that Officer Granados failed to protect him from Offender Bethany's May 13, 2012 assault because, as the picket officer, he should have observed that there was hot pot in the dayroom in violation of TDCJ policy and had it removed prior to the incident. (*See* D.E.88, p. 2, plaintiff's SJM). Specifically, plaintiff contends that:

> Neither Defendant Bradford nor Defendant Granados prevented the offender who assaulted Plaintiff from entering the dayroom with the hotpot with which the offender used to boil water and douse the Plaintiff with.

*Id.*, ¶4.

It is well settled that the Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).   However, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety.  *Id.* at 834.  In order for prison officials to be held liable under the Eighth Amendment for failure to protect, a prisoner must prove that the official knew of and disregarded an excessive risk to the inmate's safety; was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also drew the inference; and failed to take reasonable remedial action.  *Id.* at 842-45.  "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as infliction of punishment."  *Id.* at 846.

Moreover, a prison official may avoid failure to protect liability if the facts demonstrate that he "responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer,* 511 U.S. at 844.   The mere negligent failure to protect a prisoner from assault does not constitute a constitutional violation unless it becomes pervasive. *Davidson v. Cannon*, 474 U.S. 344, 347-78 (1986); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990).  Finally, the Fifth Circuit has noted that "no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate

threatened with physical violence." *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006).

In this case, plaintiff cannot prevail on his failure to protect claim against Officer Granados as there is simply no evidence that Officer Granados, prior to the assault, was aware of a substantial risk of harm to plaintiff, and then ignored that risk.   To the contrary, plaintiff admitted at the *Spears* hearing that, prior to the assault, he had not had any serious problems with Offender Bethany.  (*See* D.E. 8, p. 9).  Indeed, plaintiff's cell was next-door to Offender Bethany's cell and they shared a common dayroom.  Prior to the attack, plaintiff had never requested to be moved, nor did he file a life in danger claim or otherwise communicate to prison officials that he believed Offender Bethany posed a serious risk to his health and safety.

In addition, Officer Granados has testified that, on the date of the assault, he simply did not observe the hot plate in the dayroom.  He states:

> … As I conducted visual checks from the picket, everything seemed to be normal and no immediate danger or hazardous conditions were visible from the picket.   When Officer Bradford began the in-and-out procedure in 1-section, I continued to visually monitor 2- and 3- section.   Then he [Officer Bradford] continued to 2-section and I monitored 1- and 3- sections.   At no time did I notice any hazardous conditions or any disturbances in any of the sections from the picket's view.   As he [Officer Bradford] exited 2-section I positioned myself in front of the 2-section control panel to work the door switches and allow Officer Bradford to exit 2- section.   This movement only takes a few seconds and this is when the assault happened.   I did not see the incident occur as I was opening the 2-section door to allow the rover to exit 2- section.   As I went to the 3-section control panel to allow the rover to continue the in-and-out in 3-section, I noticed an inmate walking towards 3-section door.   At this time, Officer

> Bradford signaled me to open 3-section door.  He [Officer
> Bradford] allowed Mr. Atkins to stand in the "D" space and I
> secured the section door to separate this inmate from the rest
> of the inmates in the section in a secured area.

(D.E. 69, Granados Aff't at ¶ 4).

The undisputed summary judgment evidence establishes that Officer Granados was not aware, nor was he in possession of facts that should have caused him to be aware, of a serious risk to plaintiff's safety on May 13, 2012 as he worked the picket. Indeed, prisons are inherently dangerous places, *Farmer*, 511 U.S. at 844, and prison officials are not expected to prevent all inmate-on-inmate violence. *Adames v. Perez,* 331 F.3d 508, 512 (5th Cir. 2003).

Plaintiff points out correctly that it was a violation of prison policy for Offender Bethany to bring a hot pot into the dayroom.  (*See* D.E. 65-5, p. 15 ("Offenders will not take stingers, hot pots, or any other type of heating element into the dayrooms.")).[9] However, the fact that Offender Bethany violated prison policy in regards to the hot pot does not equate with a finding that Officer Granados was deliberately indifferent to plaintiff's safety.  *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (prison officials' failure to follow or enforce prison administrative rules does not in and of itself raise federal constitutional issues as long as minimum constitutional requirements are met).  Indeed, in his Step 1 grievance, plaintiff stated that the working officers were "negligent" in failing to notice the hotpot in the dayroom.    (*See* D.E. 81-4, p. 3:

---

[9] Officer Granados also notes this policy and testified that, had he observed a hot pot, he would have notified the rover to confiscate it and would then write the offender a disciplinary case.  (D.E. 69 at 4, Granados Aff't at ¶ 6).  However, on May 13, 2012, Officer Granados states that "At no time did I see a hot pot in this dayroom."  *Id.*

"[defendants] … who through negligence did not make sure that there wasn't anything out of compliance on 3-section D-pod.").  Negligence, however, does not encompass the requirements of a failure to protect claim which requires the plaintiff to establish that the defendant knew or should have known of a serious risk to the inmate's safety, and also, that the defendant then chose to ignore that risk.  *See Eason v. Thaler*, 73 F.3d 1322, 1328-29 (5th Cir. 1996) (noting that negligence cannot support an Eighth Amendment claim based upon a prison official's gross negligence).

There is no genuine issue of a material fact on the issue of whether Officer Granados knew or should have known that Offender Bethany would assault plaintiff with boiling water on May 13, 2012.  Plaintiff had not claimed that he was in danger or otherwise sought protection from prison officials, and there is no evidence that Offender Bethany was a violent inmate who needed to be segregated from the others.  In fact, following the May 13, 2012 altercation, Offender Bethany filed a life in danger claim alleging that plaintiff intimidated "weaker inmates" and had threatened Offender Bethany with a "shank."  (D.E. 65-2, p. 16).  Investigation of the incident concluded that plaintiff and Offender Bethany simply got into a verbal argument about the television that escalated into violence when Offender Bethany threw the boiling water on plaintiff.  *Id.*  The incident could neither be predicted nor prevented, and Officer Granados is entitled to summary judgment in his favor, and dismissal with prejudice of plaintiff's claims against him.[10]

---

[10] Officer Granados also moves for summary judgment to dismiss plaintiff's claims for money damages against him in his official capacity as barred by the eleventh amendment.  (D.E. 65, p. 5).  Those claims were previously dismissed by the Court as to all defendants.  (*See* D.E. 10 at 2).

**C.     The medical defendants' motion for summary judgment.**

Plaintiff claims that the medical defendants were deliberately indifferent to his serious medical needs because they treated him initially with only ointment and non-Aspirin, when instead, he should have been sent immediately to the emergency room or hospital.  (D.E. 88, pp. 8-10).

To state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Wilson v. Seiter*, 501 U.S. 294, 303(1991); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).  In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citation omitted).   However, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances."  *Sama v. Hannigan,* 669 F.3d 585, 590 (5th Cir. 2012).

The decision of whether to provide additional treatment is a classic example of a matter of medical judgment."  *See Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001) (internal quotation marks and citation omitted).  As discussed below, the summary judgment evidence demonstrates that, viewed in the light most

favorable to plaintiff, his claims are no more than a disagreement over the specific treatment he received such that he has fails to state a claim for deliberate indifference.

Plaintiff's medical records demonstrate that, on the night of the assault, plaintiff arrived at the infirmary at 10:15 p.m. and was seen at that time by Nurse Perales.  (D.E. 84, p. 27).   Nurse Perales conducted a complete examination that included: (1) pain assessment; (2) eye, motor and verbal responses over time; (3) vital signs; (4) strength; and (5) range of motion.  *Id.*, pp. 27-28.  Nurse Perales even conducted a vision acuity test. *Id.* p. 29.  In addition, Nurse Perales contacted the main provider, Dr. Whitt, and advised her of plaintiff's injuries and current condition.  *Id.* at 32.  Per Dr. Whitt's orders, Nurse Perales dressed plaintiff's wounds, applied an eye ointment and patch, and gave him Tylenol for pain.  *Id.*  He was instructed to return the following day for follow-up care. *Id.*

The next day, plaintiff was seen by NP Hudson who secured him an emergency appointment for his eye.  (D.E. 84, p. 22).  She redressed his burns with Silvadene, and gave him one Tylenol #3 at the appointment, and ordered that he receive 2 Tylenol 325 mg every four hours.  *Id.*  She applied eye ointment, and an eye patch.  *Id.* Plaintiff arrived at Hospital Galveston the following day at approximately noon.  (D.E. 84, p. 18).

Plaintiff's records thus demonstrate that he was seen for his injuries and given medical treatment.  He was not denied nor delayed care by the medical defendants, and indeed, he does not allege to the contrary.  Rather, plaintiff's claims are founded in his opinion that his injuries were so serious that it amounted to deliberate indifference to keep him at the McConnell Unit for two nights.

In support of their motion for summary judgment, the medical defendants offer the affidavit of Dr. Bowers.  (D.E. 84-3, pp. 2-6).  Dr.  Bowers testifies that he has reviewed plaintiff's medical records and:

> Based upon my education, training, and experience as a physician both in the free world and correctional setting, I believe the medical treatment/care provided to Mr. Atkins by Dr. Whitt, NP Hudson and LVN Perales was both appropriate and performed within the proper standard of care.  I believe any other reasonably well-trained physician, nurse practitioner, or licensed vocational nurse under the same or similar circumstances and knowing what the defendants knew at the time, would have provided the same treatment/care and believed that doing so was responsible and done in good faith.

(D.E. 84-3, p. 5).  In addition, Dr. Bowers notes that, according to his medical records, plaintiff did not suffer an infection at any time from his burns, and therefore, he did not sustain any additional scarring or damage by not being transferred the night of the assault.  *Id.*  Dr. Bowers notes further that plaintiff did not suffer any permanent damage to his right eye.  *Id.* (*See also, D.*E. 84, p. 3-4, October 1, 2012 Hospital Galveston Ophthalmology Clinic report).

There is no dispute that plaintiff sustained serious and painful injuries as a result of Offender Bethany scalding him with boiling water; however, the medical defendants evaluated, accessed and treated plaintiff within acceptable medical standards.  (D.E. 84-3, p. 5).  Perhaps in contrast to the response of the Burn Unit personnel who immediately prescribed narcotic pain medication to help plaintiff with his pain, Dr. Whitt's decision to prescribe only Tylenol can be characterized as inadequate.  Yet, despite plaintiff's allegations of insufferable  pain, there is no record that he requested to return to the

infirmary or to be seen earlier than his appointment the following day, at which time NP Hudson did give him one Tylenol #3.  Indeed, the Fifth Circuit has found no deliberate indifference where a unit physician discontinued a narcotic pain medication prescribed by doctors at Hospital Galveston and substituted a non-steroid anti-inflammatory medication.  *See Williams v. Berry*, 273 F.3d 1096, 2001 WL 1085197, *3 (5th Cir., Sept. 7, 2001) (not published).

Plaintiff has failed to establish that any medical defendant denied him prompt and appropriate treatment for his multiple burns while under their care at the McConnell Unit.  To the extent he disagrees with the level of care that he received from these defendants, the Fifth Circuit has repeatedly held that a mere disagreement with the course of medical treatment prescribed does not state a claim for deliberate indifference.  *See Stewart v. Murphy,* 174 F.3d 530, 535 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter,* 766 F.2d 179, 181 (5th Cir. 1985); *Young v. Gray,* 560 F.2d 201, 201 (5th Cir. 1977).  Indeed, even if a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not a constitutional violation.  *See Harris v. Hegman,* 198 F.3d153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh,*, 989 F.2d 191, 195 (5th Cir. 1993)).  Allegations of unsuccessful medical treatment, acts of negligence, or medical malpractice "do not constitute deliberate indifference."  *Golbert,* 463 F.3d at 347.

Viewing all the evidence in the light most favorable to plaintiff, as non-movant, plaintiff does not show that he was refused care or adequate medication and he does not otherwise demonstrate that the medical defendants intentionally treated him incorrectly

with wanton disregard for his serious medical needs.  *See Domino*, 239 F.3d at 756. Plaintiff's allegations concerning the level of care he received are not sufficient to raise a genuine issue of material fact on whether he was treated with deliberate indifference and they do not articulate a violation of the Eighth Amendment.  Because plaintiff fails to establish that relief is available under § 1983, the medical defendants are entitled to summary judgment in their favor.

**VI.    Recommendation.**

Based on the foregoing, it is respectfully recommended that the Court:

(1)    Deny the medical defendants' motion to dismiss (D.E.81);

(2)    Grant Officer Granados' motion for summary judgment (D.E. 65), and dismiss plaintiff's claims against him with prejudice;

(3)    Grant the medical defendants' motion for summary judgment (D.E. 83), and dismiss with prejudice plaintiff's claims against these defendants;

(4)    Deny plaintiff's cross-motion for summary judgment (D.E. 88); and

(5)    Grant plaintiff's July 22, 2013 oral motion to dismiss without prejudice his claims against Officer Bradford in his individual capacity.

Respectfully submitted this 15th day of November, 2013.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).